IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| JONOTHAN W. GRACE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:05-CV-063 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act. As an initial matter, the court wishes to stress that it is not unsympathetic to plaintiff's traumatic injury. However, for the reasons provided herein, defendant's motion for summary judgment [doc. 12] must be granted, and plaintiff's motion for summary judgment [doc. 8] must be denied. The final decision of the Commissioner will be affirmed.

I.

*Background*

Plaintiff was born in 1965 and has a twelfth grade education. [Tr. 102, 413]. His relevant employment background includes jobs as a courier, mechanic, and supermarket clerk. [Tr. 113]. In January 1995, an on-the-job accident resulted in the full-to-partial

amputation of all four fingers on the left hand. [Tr. 184, 200, 204].

Plaintiff applied for benefits in July 2000, claiming to be disabled by "eye damage," missing fingers, and post-traumatic stress disorder. [Tr. 102, 112]. He alleged a disability onset date of January 25, 1995. [Tr. 102]. The application was denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on August 21, 2001.

On November 2, 2001, the ALJ issued a decision denying benefits. Therein, the ALJ found that plaintiff "is status-post amputation of the fingers on his left hand and that he experiences [Horner's] syndrome involving his left eye," which are "severe" impairments but not equivalent, singularly or in concert, to any impairment listed by the Commissioner. [Tr. 48]. Plaintiff's credibility was found to be "very poor" because he "has told a number of different stories about his work history and his reasons for stopping work." [Tr. 47]. The ALJ concluded that "[b]ecause the claimant's [sic] has the exertional capacity to perform substantially all of the requirements of light work, and considering the claimant's age, education, and work experience, a finding of 'not disabled' is supported by application of Medical-Vocational Rule 202.20." [Tr. 50].

Plaintiff then sought review from the Commissioner's Appeals Council, which granted remand. [Tr. 56]. The Appeals Council ordered the ALJ to, *inter alia*, further evaluate plaintiff's: (1) recent work history; (2) alleged mental impairments; and (3) alleged visual impairments. [Tr. 57-58].

Following a second administrative hearing, the ALJ again rendered a decision denying benefits.[1] Therein, the ALJ concluded that plaintiff's post-traumatic stress disorder and loss of fingers - but not his Horner's syndrome - were "severe" impairments. [Tr. 18]. These severe impairments were again found not to be equivalent to any impairment listed by the Commissioner, and plaintiff's complaints were again found to be not entirely credible. [Tr. 18, 20].[2] The ALJ concluded, based on vocational expert testimony, that plaintiff retained the residual functional capacity to engage in a significant number of jobs existing in the national economy. [Tr. 21].[3] Plaintiff was accordingly found "not disabled."[4]

---

[1] At the second hearing, plaintiff amended his alleged onset date from January 1995 to September 15, 1999: (1) because he worked as a courier for two years after his injury; and (2) because he received one year of unemployment compensation benefits after stopping work as a courier. [Tr. 421-22].

[2] The ALJ commented in material part that:

I am not persuaded that the claimant's allegations of totally disabling impairments are completely credible. While he alleges an inability to work, he has never even sought employment. The claimant worked for two years after losing the fingers, so there is evidence that he can engage in substantial gainful activity with the hand impairment. Further, he reported to the consultative physician that he had not sought employment because he was helping to care for his sister-in-law's children, not because of an inability to work. He additionally reported engaging in a wide range of daily activities . . . .

[Tr. 20].

[3] In material part, the ALJ's RFC determination included the ability to "'occasionally' handle and finger with the left extremity." [Tr. 20, 22].

[4] At his second hearing, plaintiff explained that he has not sought employment over the past several years because "I don't trust anybody." [Tr. 423]. As correctly noted by the ALJ, "whether [plaintiff] trust[s] somebody or not is completely immaterial to whether or not [he] can work." [Tr. 423].

3

Plaintiff again sought Appeals Council review, which was denied on December 1, 2004. [Tr. 6]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Relevant Medical Background*

A. <u>Physical</u>

Ten weeks after plaintiff's on-the-job injury, hand surgeon Leonard Goldstock wrote that plaintiff was "doing quite well." [Tr. 191]. Hand surgeon Anne Rosenthal recommended job retraining and psychiatric care. [Tr. 192].

In June 1995, surgeon Julian Pribaz noted some ability to "pinch" between the thumb and the remaining portions of the index and little fingers. [Tr. 201]. Dr. Pribaz opined that "I think he would be suitable for re-training to perform a less arduous job as his hand can still be a useful hand as a helper hand. However, he will not be able to do the heavy type of work that he used to do." [Tr. 201].

The Rehabilitation Services Department of Parkland Medical Center generated an April 1996 Functional Capacity Evaluation. The evaluators noted some ability to grip with the left hand, although grip strength was obviously reduced. [Tr. 217-18]. Cramping and stiffness were reported after four to five minutes of activity. [Tr. 217]. The evaluators opined that plaintiff possesses the capacity for light lifting, but he "would be unable to

4

perform any repetitive left handed activities for greater than four minutes at one time." [Tr. 221]. Dr. Jonathan Sobel assigned a sixty percent impairment of the left hand. [Tr. 244].

In autumn 1998, plaintiff began to complain of blurred vision and difficulty adjusting to changes in light. [Tr. 259, 266]. He attributed the problems to a recent increase in Prozac dosage. [Tr. 257]. Following examination in July 1999, optometrist Kevin Chauvette wrote in material part:

> Mr. Grace has an acquired left pupillary anomaly most likely related to an adverse reaction to the increased dose of Prozac. This pharmacological toxicity presumably effected [sic] one of the nerves responsible for closure of the pupil. . . .
>
> As a likely consequence of the Prozac toxicity, Mr. Grace also suffers from visual midline shift syndrome. This is characterized by his altered perception of his own midline as it relates to other objects in space. . . . Until we are able to assess Mr. Grace's response to [] therapy, my suggestion is that he not participate in activities or employment duties which require more than 10 minutes of near work at a time. I also recommend that Mr. Grace wear special adjustable sunglasses when doing any outdoor work due to his increased light sensitivity. Mr. Grace currently possesses all of the visual skills necessary for driving, although his reaction time and self confidence may still need to be assessed. Other than the limited near work and attention to extreme light sources Mr. Grace has many employment possibilities open to him. . . .

[Tr. 299].[5]

---

[5] At his second administrative hearing, plaintiff summarized his vision complaints as follows:

> If I stand so long in a bright light, my eye hurts.
>
> . . .
>
> . . . I got to concentrate my eyes to focus on one certain spot. If I look at one certain
>
> (continued...)

5

Dr. Philip Bickers performed a consultative examination in August 2000. Vision was 20/20 in each eye, although the left pupil appeared "enlarged [and] very poorly functioning." [Tr. 311]. Range of motion of the left little finger was "fairly good." [Tr. 311]. Dr. Bickers' conclusion were:

    1. Absent fingers on the left hand with inability to grasp.

    2. Horner's syndrome involving his left eye.

    3. Depression.

    4. Poorly functioning left eye as far as discomfort is concerned, but as far as vision is concerned he is still fairly functional.

[Tr. 312].[6]

Dr. James Lester performed a Physical Residual Functional Capacity Assessment ("RFC") in September 2000. Dr. Lester predicted that plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty pounds. [Tr. 318]. He assessed plaintiff as "limited" in the visual categories of accommodation and depth perception. [Tr. 320]. Additional handwritten comments pertaining to vision are illegible. [Tr. 320].

---

[5](...continued)
spot, everything else around that spot is blurry. But I can see what I'm looking straight at.

[Tr. 429].

[6] Horner's syndrome is defined as "sinking in of the eyeball, ptosis of the upper eyelid, slight elevation of the lower lid, constriction of the pupil, narrowing of the palpebral fissure, and anhidrosis and flushing of the affected side of the face[.]" *Dorland's Illustrated Medical Dictionary* 1757 (29th ed. 2000).

6

A second RFC was completed by Dr. James Moore in November 2000. Dr. Moore: (1) shared Dr. Lester's views regarding lifting ability; (2) found no visual limitations; and (3) assessed plaintiff as having "limited" left-handed abilities of gross and fine manipulation. [Tr. 339, 341].

## B. Mental

The medical record reflects diagnoses of post-traumatic stress disorder with complaints of nightmares, anxiety, and flashbacks. [Tr. 194, 209, 226, 243, 275]. Plaintiff visited four times with psychiatrist Jonathan Schwartz in 1998. A year later, Dr. Schwartz wrote:

> I diagnosed Mr. Grace as suffering from Posttraumatic Stress Disorder, Depressive Disorder, Not Otherwise Specified, and likely Panic Disorder. Based on the facts reported, these illnesses were secondary to an accident and injury suffered at his employment in January, 1995.
>
> Mr. Grace suffered with significant symptoms as a result of the above illnesses. There was considerable limitation of functioning as a consequence of these, both in a work-related and non work-related setting. While there was improvement during the three months that I met with him, symptoms were still present at the time of our last visit. His ultimate prognosis could not be determined, based on these four sessions.

[Tr. 309].

Clinical psychologist Roy Nevils performed a consultative examination in August 2000, concluding that:

7

> Mr. Grace reports continuing problems with post-traumatic stress disorder. This may cause some limitations on his adaptability in that he has some difficulties involving driving. Otherwise, there does not appear to be major problems [sic] of memory, concentration, or interpersonal relationship due to mental disorder.

[Tr. 316].

A Psychiatric Review Technique and Mental RFC was performed in September 2000 (physician signature illegible). No limitations of listing-level severity, and no limitations of more than a moderate degree, were predicted. [Tr. 332-35].

In 2003, plaintiff reported that his flashbacks had become infrequent. [Tr. 351, 355]. Concentration remained "off a bit." [Tr. 355]. Cherokee Health Systems evaluator Jeff Greenwood described plaintiff's depression as "contained" and his anxiety as "mild." [Tr. 377].

III.

*Vocational Expert Testimony*

Vocational expert Dr. Ernest Brewer ("Dr. Brewer" or "VE") testified at plaintiff's second administrative hearing. The ALJ presented a hypothetical worker of plaintiff's age, education, and prior work experience, subject to the information contained in: the consultative reports of Drs. Bickers and Nevils; the mental RFC; and Dr. Moore's physical RFC. [Tr. 431].

Dr. Brewer testified that the hypothetical worker would be able to perform "predominantly . . . entry-level light jobs." [Tr. 431]. As examples, the VE listed video

8

rental clerk (2,755 jobs in Tennessee, 145,000 nationally), gate tender (15,835 jobs in Tennessee, 795,000 nationally), and parking lot attendant (7,800 jobs in Tennessee, 248,000 nationally). [Tr. 431-32]. Plaintiff's testimony pertaining to his vision complaints, if fully credited, "wouldn't significantly affect the jobs identified." [Tr. 432]. If plaintiff was "seriously limited" due to headaches, persistence, pace, and concentration, it would "be hard for him to meet the minimal requirements for competitive work." [Tr. 432].[7]

IV.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow

---

[7] No medical source of record has opined that plaintiff suffers from such serious limitations.

9

scope of review. *Universal Camera*, 340 U.S. at 490, 71 S. Ct. at 466.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520 (1997)). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id*.

V.

*Analysis*

The following arguments can be discerned from plaintiff's summary judgment brief:

1. At step two of the sequential evaluation process, plaintiff should have been found to have a "severe" impairment of the left eye.

2. The ALJ offered an incomplete hypothetical to the VE.

3. In his residual functional capacity findings, the ALJ erroneously concluded that plaintiff "can 'occasionally' handle and finger with the left extremity."

The court will address these issues in turn.

A. <u>Severe Vision Impairment</u>

In his second decision, the ALJ found only two "severe" impairments - post-traumatic stress disorder and loss of fingers. Plaintiff's vision complaints were not considered "severe."

Plaintiff first argues that the record establishes that his vision impairment is "severe." He points out that the "severe" impairment threshold of step two is a "*de minimis*

11

hurdle" which is to be used only "as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988) (citation omitted). Assuming that plaintiff's vision impairment is in fact "severe," his reliance on *Higgs* is nonetheless misplaced.

> We find it unnecessary to decide this question. According to the regulations, upon determining that a claimant has one severe impairment, the [Commissioner] must continue with the remaining steps in [her] disability evaluation as outlined above. In the instant case, the [Commissioner] found that [plaintiff] suffered from the severe impairment[s] of [post-traumatic stress disorder and loss of fingers]. Accordingly, the [Commissioner] continued with the remaining steps in [her] disability determination. Since the [Commissioner] properly could consider claimant's [optical] condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the [Commissioner's] failure to find that claimant's [vision] constituted a severe impairment could not constitute reversible error.

*Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Plaintiff next argues that, because his eye impairment was found to be "severe" in the ALJ's first decision, the principle of *res judicata* mandates the same result thereafter.

> Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.
>
> . . .
>
> . . . When the Commissioner has made *a final decision* concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances.

*Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997) (emphasis added).

Like his citation to *Higgs*, plaintiff's reliance on *Drummond* is misplaced. *Drummond* binds the Commissioner only in cases where there has been a prior "final decision." Where, as here, a previous decision has been vacated by the Appeals Council, there is no prior "final decision." *Wireman v. Comm'r of Soc. Sec.*, No. 02-5612, 2003 WL 1465387, at *1 (6th Cir. Mar. 19, 2003); 20 C.F.R. § 404.955(a) ("The decision of the administrative law judge is binding on all parties to the hearing unless [y]ou or another party request a review of the decision by the Appeals Council within the stated time period, and the Appeals Council reviews your case[.]"). The present ALJ therefore was not bound by his initial findings. *Wireman*, 2003 WL 1465387, at *1.

## B. Hypothetical Question

Plaintiff next challenges the vocational hypothetical offered to Dr. Brewer. Plaintiff contends that the ALJ failed to: (1) comply with the Appeals Council's directive to further evaluate his residual functional capacity in light of the vision impairment; (2) explain the weight given to Dr. Lester's RFC; and (3) consider updated mental health records from Cherokee Health Systems. Upon review, the court finds no merit in these issues.

The ALJ did comply with the Appeals Council's instructions to further evaluate work-related visual limitations. The ALJ discussed in detail Dr. Bickers' evaluation, including the finding that "the left eye is still fairly functional in regards to vision[.]" [Tr. 18]. Further, Dr. Bickers' evaluation (noting eye discomfort and a "fairly functional" left eye with 20/20 vision) was wholly incorporated into the vocational hypothetical.

13

Plaintiff's primary complaint is that Dr. Lester's RFC was not also made a part of the hypothetical. In material part, Dr. Lester found that plaintiff would be "limited" in depth perception and visual accommodation. The ALJ did not explain his exclusion of these limitations.[8] Any potential error, however, would be harmless. Upon examination by plaintiff's counsel, the VE testified that even if plaintiff's eye complaints were fully credited, they "wouldn't significantly affect the jobs identified." [Tr. 432]. Further, according to the Dictionary of Occupational Titles, two of the three jobs cited by the VE involve neither depth perception nor accommodation. *See* DICOT 295.367-018, 372.667-030.

Lastly, regarding the updated records of Cherokee Health Systems and the limitations plaintiff cites therein, the court's review of those records finds no more than "moderate" limitations predicted in any psychological realm of functioning. [Tr. 79-81]. These predictions are merely cumulative of Dr. Nevils' consultative assessment and the Mental RFC, both of which were incorporated into the vocational hypothetical. The ALJ discussed the Cherokee records, finding that they indicated only "moderate symptoms." [Tr. 18-19]. No further attention to these cumulative records was necessary.

## C. Handling and Fingering

In response to the ALJ's finding that he "can 'occasionally' handle and finger with the left extremity," plaintiff asks "How could a person be expected to occasionally

---

[8] While these limitations are favorable to plaintiff, the court observes (viewing the record as a whole) that the ALJ also did not discuss the unfavorable findings of examining Dr. Chauvette, who concluded that despite his optical challenges plaintiff "has many employment possibilities open to him." [Tr. 299].

14

'finger' when he has no fingers?" Neither party cites the court to a pertinent definition of "fingering." By way of comparison, however, the court observes that the Commissioner's physical RFC form defines "fingering" as "fine manipulation." [Tr. 320].

Assuming that the ALJ erred in this finding, such error would again be harmless. According to the Dictionary of Occupational Titles, two of the three jobs cited by the VE require no "fingering." *See* DICOT 295.367-018, 372.667-030. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

In conclusion, the court again stresses that it is not unsympathetic to plaintiff's traumatic injury. Nonetheless, because the final decision of the Commissioner survives substantial evidence review, that decision must be affirmed. An order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan
United States District Judge